723 P.2d 648
**UNIVERSITY MECHANICAL CONTRACTORS OF ARIZONA, INC.,**
Plaintiff/Appellee,

v.

**PURITAN INSURANCE COMPANY,**
Garnishee/Appellant.

**No. 18198–PR.**

Supreme Court of Arizona,
En Banc.

June 18, 1986.

HAYS, Justice.

University Mechanical Contractors of Arizona, Inc. (University), has petitioned this court for review of the appeals court's decision in *University Mechanical Contractors of Arizona, Inc. v. Puritan Insurance Co.*, 150 Ariz. 337, 723 P.2d 686 (1985). That opinion reversed a trial court action which entered judgment on a writ of garnishment in favor of University. We accepted review and have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and Rule 23, R.Civ.App.P., 17A A.R.S.

## FACTS

In 1978, University purchased from Insta-Foam Products, Inc. (Insta-Foam), a system of pipe and O-ring couplings designed by Insta-Foam. These couplings were for use in a solar heating and cooling facility at the Yuma Proving Grounds which University was under contract to build.

In December, 1978, University began installing the system. Sometime after the Insta-Foam parts were installed, leaks developed due to problems with the O-rings and the pipe. University attempted to correct the problem by beveling the pipe and eventually reinstalled it in early 1979. At that time the system was pressure-tested for leaks and none were discovered.

Because of another subcontractor's failure to supply a major component of the facility, the Insta-Foam system remained sealed and unused for nearly a year. The facility allegedly became operational in December, 1979; however, it appears from the record that the actual date may have been closer to April, 1980. Nevertheless, it is undisputed that within two weeks after beginning operation of the solar heating and cooling system, large amounts of water began leaking from the system. Initially, certain leaks were located and repaired by University. Within a short time, however, more leaks were found and University was forced to repair the entire system of couplings.

After obtaining a judgment of $96,599.72 against Insta-Foam, University filed a writ of garnishment against Puritan Insurance Company (Puritan). The writ was based on a comprehensive general liability policy issued by Puritan to Insta-Foam on October 13, 1978. The policy was to be effective for one year until October 13, 1979.

Puritan answered University's writ of garnishment by denying that the loss was covered. After trial, however, judgment was entered on the writ of garnishment in favor of University. The trial court based its ruling on a finding of fact that the insurance policy was in full force and effect at the time Insta-Foam delivered the

products to University and therefore there was coverage under the policy.

Puritan appealed from the judgment and the court of appeals reversed, holding that, since the accident did not occur until at least two months after the policy had expired, there was no coverage under the general liability policy issued by Puritan.

■ In Arizona, the interpretation of an insurance contract is a question of law to be determined by this court, independent of the findings of the trial court. *Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982), *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982); *see also State Farm Fire & Casualty Co. v. Rossini*, 107 Ariz. 561, 564, 490 P.2d 567, 570 (1971). On appeal, we will sustain the trial court's ruling on any theory supported by the evidence, even though the trial court's reasoning may differ from our own. *Sparks v. Republic National Life Insurance Co.*, 132 Ariz at 534, 647 P.2d at 1132; *see also Minderman v. Perry*, 103 Ariz. 91, 93, 437 P.2d 407, 409 (1968). Here, the trial court found that the damages incurred by University were covered by the Puritan policy held by Insta-Foam. We agree.

Under the policy at issue, Puritan agreed to pay any costs which Insta-Foam became legally obligated to pay as damages because of "property damage ... caused by an occurrence ...." The policy defines the term "property damage" in two different clauses:

(1) Physical injury to or destruction of tangible property which occurs during the policy period, *including the loss of use thereof at any time resulting therefrom,* or (2) loss of use of tangible property which has not been physically injured or destroyed provided such a loss of use is *caused by an occurrence during the policy period* (emphasis added).

The policy also defines an "occurrence" as:

An accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

With these definitions clearly in mind, we can proceed.

In the present case, the appeals court reversed on the grounds that the policy requires (1) that there be an accident which causes property damage, and (2) that the property damage occur during the policy period. In so holding, the court relied on *Outdoor World v. Continental Casualty Co.*, 122 Ariz. 292, 594 P.2d 546 (App.1979). In *Outdoor World,* a boat having a defective steering mechanism was sold during the policy period to a customer. It was not until after the policy period had expired, however, that the customer was injured in an accident. The dispute on appeal centered on whether coverage was limited, by the policy definition of "occurrence," to injuries which occurred during the policy period. The policy definition of "occurrence" was the following:

'[O]ccurrence' means an accident, including injurious exposure to conditions, which results, *during the policy period,* in bodily injury or property damage neither expected nor intended from the standpoint of the insured; ... (emphasis added).

*Outdoor World v. Continental Casualty Co.*, 122 Ariz. at 293, 594 P.2d at 547. The definition of "occurrence" employed in *Outdoor World* clearly required the accident to *result* in bodily injury during the policy period. The accident, however, resulted in bodily injury only after the policy expired and therefore did not fall within the terms of coverage.

The definition of "occurrence" in this case, however, is significantly different from the definition of the same word in *Outdoor World.* Here, the critical language "during the policy period" is not contained in the Puritan definition of "occurrence." The Puritan policy merely defines an "occurrence" as an accident which results in property damage, without any limitation as to time.

For this reason, University asks us to consider the decision of the Wisconsin Court of Appeals in *Western Casualty &*

*Surety Co. v. Budrus,* 112 Wis.2d 348, 332 N.W.2d 837 (App.1983). There, the policy definition of "occurrence" was the same as that used in the Puritan policy. That policy also contained a definition of "property damage" identical to that used in clause (2) of the policy before us.

In *Western Casualty,* the insured negligently sold mistagged seed to a customer. Although the seed was sold during the policy period, it was not planted until the term of insurance had expired. As the crop grew, the customer discovered that it was a crop which was of no value to him. The customer sued the seller for the resulting damages. The insurer, Western Casualty, denied that it had an obligation to defend the sale of the mistagged seed. It claimed that since there was no loss of use of tangible property, and no occurrence during the policy period, there was no coverage for the loss under the policy. In holding that Western Casualty did in fact have a duty to defend its insured, the court stated:

> The policy defines occurrence as an "accident ... which results in property damage." There is no requirement that the resulting damage arise during the policy period. It requires only that the accident occur during the policy period. When the term "property damage" is defined, the policy requires only that the loss of property use be caused by an "occurrence during the policy period." Here, the negligent act of selling the mistagged seed, which caused the damage, occurred during the policy period.... Finally, to interpret the policy to exclude coverage would also cause an absurd result. It was only by chance that Richter planted the properly tagged seed in 1979. Coverage afforded under the policy should be determined by the parties to the contract and not by a third party's fortuitous act.

*Western Casualty & Surety Co. v. Budrus,* 332 N.W.2d at 840.

■ While we find this logic and reasoning persuasive, we note a critical flaw as it relates to this case. Here, if one combines the policy definition of "occurrence" with clause (2) of the Puritan definition of property damage, the result is the same as that which was before our appeals court in *Outdoor World.* In other words, coverage is provided for "loss of use of tangible property which has not been physically injured or destroyed, provided such a loss of use is caused by an [accident ... which results in ... property damage ...] *during the policy period.*" (Emphasis added.) As the accident in this case did not occur until at least two months after the policy had expired, it would appear that clause (2), on its face, does not provide coverage for University's loss.

■ The fact that coverage is not available under clause (2) does not, however, end our inquiry. Clause (1) of the "property damage" definition provides coverage for "[p]hysical injury to ... tangible property which occurs during the policy period, including the loss of use [of tangible property—here, the solar facility] *at any time resulting therefrom.*" (Emphasis added.) Under this clause, we believe the Puritan policy provides coverage for the claimed loss.

The Insta-Foam pipe and O-ring couplings were sold and shipped by the insured during the policy period. Even as the goods were being installed, which was still during the policy period, they began to leak. The determination of what caused the leaking was set forth by the trial court in its findings of fact:

> 9. The leaking was caused by three factors: (1) the O-rings supplied by INSTA–FOAM were the wrong size for the pipe and coupling; (2) the pipe was too rough to accommodate expansion and contraction without causing the O-rings to wear; and (3) the grooves in the couplings manufactured by INSTA–FOAM and supplied to UNIVERSITY were too shallow and too sharp, and thereby caused cutting of the O-rings when the pipe expanded and contracted as planned.

Thus, installation of the faulty couplings clearly constituted physical injury to the solar facility (tangible property). More-

over, as a result of the installation of these parts, there was a definite loss of the facility's use. As this loss of use can occur at any time under clause (1), it need not be during the policy period for coverage to exist.

Accordingly, we find that the first clause of the "property damage" definition set forth in the Puritan policy creates coverage for the suffered loss. As the two clauses defining property damage are disjunctive, coverage may be found under either clause. Therefore, the inapplicability of clause (2) does not act to defeat that coverage.

Having found coverage under the Puritan policy, we need not address the remaining issues on appeal.

The opinion of the court of appeals is vacated and the judgment of the trial court is hereby affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.